UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT BETTENCOURT,<br><br>Plaintiff,<br><br>v.<br><br>BRISTOL COUNTY SHERIFF'S OFFICE,<br><br>Defendant. | Civil Action No.<br>24-10561-BEM |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MURPHY, J.**

On September 29, 2023, Plaintiff Robert Bettencourt was terminated from his job with the Bristol County Sheriff's Office (the "BCSO"). Weeks earlier, Plaintiff had returned from several months of medical leave. He alleges that the BCSO terminated his position because of his statutorily protected medical absence, in violation of the Family Medical Leave Act (the "FMLA") and the Massachusetts Paid Family and Medical Leave Act (the "PFMLA"). The BCSO moves for summary judgement, arguing that the factual record establishes that Plaintiff was dismissed for other reasons—not for exercising his rights under the FMLA and PFMLA. Because Plaintiff raises a genuine dispute of material fact as to whether the BCSO's stated reasons for his termination were pretextual, the Court will grant summary judgment for the BCSO as to the interference claims raised under FMLA or PFMLA and deny the motion for summary judgment as to the retaliation claims under the same.

## I. Factual & Procedural Background

### A. Plaintiff's Medical Leave and Termination

Except as noted, the following facts are undisputed and are drawn from Plaintiff's responses to the BCSO's statement of material facts. Dkt. 45 ("SMF").

Plaintiff worked as a corrections officer with the BCSO beginning in 1993. *Id.* ¶ 1. In 2007, Plaintiff was diagnosed with Crohn's disease, which caused him long-term epigastric pain and associated anxiety. *Id.* ¶ 7. During his time at the BCSO, Plaintiff would take personal days, vacation time, and sick days to manage flare ups associated with his Crohn's disease. *Id.* ¶ 8. Beginning in 2018 or 2019, Plaintiff was assigned to a joint task force with members of the Dartmouth Police Department and BCSO (the "Task Force") to assist the Department in ongoing investigations. *Id.* ¶¶ 2–3.

On November 9, 2022, Paul Heroux was elected Bristol County Sheriff. *Id.* ¶ 4. He was inaugurated on January 3, 2023, and officially began his duties on January 4, 2023. *Id.* ¶¶ 4, 6. After his inauguration, Heroux embarked on an effort to reorganize the BCSO and eliminate BCSO units not directly tied to the county jail. *Id.* ¶ 11. One such unit was the Task Force. *Id.* ¶ 12. By early February 2023, BCSO Superintendent Steven Souza informed Plaintiff that he would no longer be assigned to the Task Force. *Id.* ¶ 13. As part of the winddown, the other three BCSO employees on the Task Force were reassigned to different roles within the BCSO. Dkt. 44-6 at 14.

Around this time, on February 1, 2023, Plaintiff applied for medical leave. SMF ¶ 14. The BCSO approved the application on February 15, 2023. *Id.* On a monthly basis, Plaintiff reapplied for medical leave and the BCSO granted each request through June 2023. *Id.* ¶¶ 14, 17. In June 2023, Plaintiff's medical leave was extended through August 2, 2023, to care for his daughter. *Id.* ¶¶ 15–16. On August 1, 2023, Plaintiff was informed that on August 2, 2023—the day his

medical leave was slated to end—he would be placed on administrative leave. *Id.* ¶¶ 18–19; *see also* Dkt. 43-9.

On September 15, 2023, Plaintiff received an employment separation letter from Heroux, informing him that the Task Force was disbanded, Plaintiff's position of Captain was eliminated, and that he would therefore be "separated from employment." Dkt. 43-15 at 1; *see also* SMF ¶ 48. The letter also noted that, though Plaintiff was terminated "based on the elimination of [his] position," preliminary results from an internal investigation also "indicate[d] that [Plaintiff] likely did engage in misconduct related to neglect of duty during a significant portion of [Plaintiff's] time on the Task Force." Dkt. 43-15 at 1. After a meeting between Plaintiff, Heroux, and lawyers for the BCSO, Plaintiff's employment was terminated, effective September 29, 2023. SMF ¶ 50; *see also* Dkt. 43-16.

**B. <u>The Internal Affairs Investigation</u>**

As his termination letter made clear, unbeknownst to Plaintiff, BCSO Internal Affairs ("IA") had, for months, been investigating alleged misconduct by Plaintiff during his time on the Task Force. SMF ¶ 20; *see also* Dkt. 43-15 at 1. Heroux first authorized the investigation in January 2023.[1] *Id.* ¶¶ 20–22. Following Plaintiff's termination, the BCSO paused its investigation into Plaintiff's alleged misconduct following his termination, though the BCSO claimed they "reserve[d] the right" to continue and complete the investigation. Dkt. 44-13.

Roughly two months *after* Plaintiff initiated this litigation, and three days *after* BCSO filed its answer, Dkt. 12, IA ultimately completed its investigation and summarized its findings in a report, dated May 9, 2024 (the "IA Report"), Dkt. 43-11; *see also* SMF ¶ 47. According to the IA

[1] Plaintiff disputes that the investigation began in January 2023. *See* Dkt. 44 at 2, 10, 15, 19. In its analysis of Plaintiff's claims, the Court will address this purported dispute in greater detail. *See infra* note 9.

Report, during his time on the Task Force, Plaintiff had "not been showing up for work."[2] Dkt. 43-11 at 1. The IA Report found that Plaintiff reported "substantial hours" of work for the Task Force, without any corresponding fuel usage recorded in his work vehicle. SMF ¶¶ 31–32; *see also* Dkt. 43-11 at 3. Additionally, the IA Report found that Plaintiff had not conducted any investigative database searches for three years despite Task Force duties requiring investigative work. SMF ¶ 33; *see also* Dkt. 43-11 at 4. The IA Report concluded that between July 2022 and the end of January 2023, Plaintiff regularly "didn't show up to work," but still reported working full eight-hour days. Dkt. 43-11 at 6. On many of those days, contrary to what he had told the Dartmouth Police Department, attendance records indicated Plaintiff was not taking in-person courses at Bridge Academy, a police training program. *Id.*; *see also* SMF ¶ 35–36. Despite stating that he did show up for work at the Task Force, Plaintiff testified that he could not recall any cases he worked on while assigned to the Dartmouth Police Department between July 2022 and February 2023. Dkt. 43-2 at 6; *see also* SMF ¶ 34.

In addition, the IA Report detailed that, in April 2022, Plaintiff was contacted by the Fairhaven Police Department for allegedly sending a harassing text to a woman. Dkt. 43-11 at 6. That same woman, eight years prior, had reported Plaintiff to the Rochester Police Department for sexual harassment. *Id.* The IA Report determined that Plaintiff notified the BCSO about his interactions with the Fairhaven Police Department months later, in February or March of 2023. *Id.*

[2] Plaintiff repeatedly disputes factual findings of the IA Report. SMF ¶¶ 26–27, 35–42, 44. For example, he claims that while he occasionally did not complete full shifts on the Task Force, he did so with the express permission of his superiors. *See e.g.*, Dkt. 43-8 at 6 ("I did not work my scheduled shift on some occasions; however, this was communicated directly to my supervisors."). However, Plaintiff does not—and cannot—dispute the fact that the IA Report included these findings. *See* Dkt. 43-11.

Ultimately, the IA Report concluded that Plaintiff had violated internal policies of the BCSO for failing to accurately report his hours while on the Task Force and to promptly report his interaction with the Fairhaven Police Department in 2022. Dkt. 43-11 at 7; *see also* SMF ¶ 42–44. Violation of those policies, according to BCSO protocols, may result in termination. SMF ¶ 45.

Plaintiff filed his complaint on March 6, 2024. Dkt. 1. On May 6, 2024, the BCSO filed its answer to Plaintiff's complaint. Dkt. 12. The case was reassigned to this Court on January 30, 2025. Dkt. 25. After discovery, the BCSO filed the instant motion for summary judgment and supporting memorandum of law on July 23, 2026. Dkts. 41–42.

## II. Legal Standard

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Grogan*, 552 F. Supp. 3d at 145 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)).

The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). However, "[t]he nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that every essential element of its claim or defense is at least trialworthy." *Price v. Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991) (emphasis

omitted). "Where the non-moving party bears the ultimate burden of proof, the non-moving party 'must present definite, competent evidence to rebut the motion.'" *Satanic Temple, Inc. v. City of Bos.*, 684 F. Supp. 3d 21, 30 (D. Mass. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)), *aff'd*, 111 F.4th 156 (1st Cir. 2024).

## III. Discussion

Plaintiff brings claims against the BCSO under two laws: the FMLA, 29 U.S.C. § 2615, and the PFMLA, Mass. Gen. Laws ch. 175M, § 9; *see also* Dkt. 1 ¶¶ 56–75. Though stylized as just one count per statute, Plaintiff raises claims of unlawful interference *and* retaliation under both statutes. Dkt. 1 ¶¶ 56–75; *see also* Dkt. 44 at 13 ("Defendant violated the FMLA and PFML[A] by retaliating against [Plaintiff] *and* unlawfully interfering with Plaintiff's rights by failing to restore Plaintiff to his position." (emphasis added)). Aside from some minor distinctions, the framework for analyzing both claims under the FMLA and PFMLA is substantially similar.[3] *See e.g.*, *McKeon v. Robert Reiser & Co.*, 770 F. Supp. 3d 351, 376 (D. Mass. 2025) ("[U]nder the PFMLA and the FMLA, violations can occur when an employee either (i) interferes with an employee's exercise of their rights under these statutes, or (ii) retaliates against an employee who

[3] In fact, Plaintiff's analyses under each statute in both his complaint and his opposition to Defendants' motion for summary judgment are near word-for-word copies. *See* Dkt. 1 at ¶¶ 56–75; *see also* Dkt. 44 at 15–19.

has exercised their rights under these statutes.").[4] Accordingly, the Court will address the two claims for unlawful interference simultaneously followed by the two retaliation claims.

**A. <u>Interference</u>**

Plaintiff claims that by terminating his position, the BCSO interfered with his rights under the FMLA and PFMLA, which require "[u]pon an employee's return, [that his] employer must reinstate [him] to the same or an equivalent position, without any loss of accrued seniority." *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 718 (1st Cir. 2014). "[T]he 'key issue' in any FMLA interference claim 'is simply whether the employer provided its employee the benefits to which she was entitled per the FMLA.'" *Gregg v. Northeastern Univ.*, 743 F. Supp. 3d 257, 276 (D. Mass. 2024) (quoting *Carrero-Ojeda*, 755 F.3d at 722). But here, "Plaintiff's theory of this claim is that his medical leave was a negative factor considered against him in the termination decision. The First Circuit has plainly stated such a 'negative factor [claim]' cannot be characterized as interference and is only a retaliation claim." *Workman v. Outfront Media, LLC*, 474 F. Supp. 3d 373, 378 (D. Mass. 2020) (quoting *Mellen v. Trs. of Bos. Univ.*, 504 F.3d 21, 27 (1st Cir. 2007)).

The crux of Plaintiff's claim is not that he was denied the benefits of his medical leave. In fact, it is undisputed that the BCSO approved Plaintiff's medical leave multiple times without issue, that Plaintiff completed the entirety of his requested leave, and that he was placed on

[4] "Massachusetts courts typically apply the framework used for retaliation claims under the FMLA" when analyzing PFMLA claims. *Kliskey v. Making Opportunity Count, Inc.*, 775 F. Supp. 3d 496, 506 (D. Mass. 2025) (citing *Corbett v. Mananto Enter., LLC*, 2024 WL 3843145, at *10–11 (Mass. June 5, 2024) ("The court turns to case law under the [FMLA] to assess the plaintiff's [PFMLA] claims because state courts have not yet had an opportunity to provide guidance on the [PFMLA] given its recent enactment.")); *see also Tardiff v. Laborers Int'l Union of N. Am. Loc. Union 609*, 2025 WL 2374000, at *12 (D. Mass. Aug. 15, 2025) ("Given the similar language and objective of the PFMLA and the FMLA, the Court will evaluate the claim using the case precedent of this Circuit developed for FMLA claims."); *Kendrick v. Zwicker & Assocs., P.C.*, 2025 WL 2793751, at *3 (D. Mass. Sept. 30, 2025) ("Both the FMLA and PFMLA retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework."); *Corbett v. Mananto Enters., LLC*, 2024 WL 3843145, at *10–11 (Mass. Super. Ct. June 5, 2024) (applying FMLA framework and relying on federal case law when analyzing a PFMLA claim).

administrative leave only after he returned. SMF ¶¶ 14–19. Instead, Plaintiff argues that the BCSO terminated him for exercising his rights under FMLA and PFMLA. Dkt. 44 at 19–20 ("Plaintiff was terminated in retaliation for taking medical leave a month after Sheriff Heroux took office. . . . The reason Plaintiff was given for his termination was blatantly false and a pretext to justify Plaintiff's termination."). These arguments are more appropriately categorized as retaliation claims, which the Court addresses below. *See infra* Section III.B. Plaintiff's opposition only bolsters the Court's conclusion. Despite broadly alleging unlawful interference and retaliation, when stating the elements of his claim, Plaintiff recites the prima facie case for a retaliation claim, *not* an interference claim.[5] Dkt. 44 at 14. Accordingly, the Court grants the BCSO's motion for summary judgment on Plaintiff's claims, insofar as they allege interference.

**B. <u>Retaliation</u>**

Retaliation claims under the FMLA are analyzed using the *McDonnell Douglas* burden-shifting framework. First, Plaintiff bears the initial burden of making a prima facie showing of retaliation. A prima facie retaliation case requires Plaintiff to allege that (1) he availed himself of a protected FMLA or PFMLA right, (2) his employer took adverse employment action against him, and (3) there was a causal connection between the protected conduct and the adverse employment action. *See Rosseau v. Clark Univ.*, 2023 WL 3435570, at *4 (D. Mass. May 12, 2023). If Plaintiff has established a prima facie case, the burden sifts to the BCSO to provide a non-discriminatory justification for its adverse employment action. *See Hodgens v. Gen.*

[5] Conflating the two is understandable. After all, "[t]here has been some confusion whether retaliation can be characterized as interference under the FMLA." *Workman*, 474 F. Supp. 3d at 377; *see also Colburn v. Parker Hannifin/Nichols Protland Div.*, 429 F.3d 325, 331–32 (1st Cir. 2005) ("[W]hether a claim is characterized as 'interference' or not, its elements actually differ depending on whether the plaintiff is, at bottom, claiming that the employer denied his . . . substantive rights under the FMLA or that the employer retaliated against him . . . for having exercised or attempted to exercise those rights.").

*Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998). If the BCSO succeeds, the burden shifts back to Plaintiff to establish that the BCSO's stated reason or reasons were pretextual. *Id.* at 161.

Viewing the record in the light most favorable to the non-movant, Plaintiff has established his prima facie case. He easily meets the first two elements. First, Plaintiff availed himself of his rights under the FMLA and PFMLA by taking medical leave beginning in February 2023. SMF ¶¶ 14–17. Second, his termination by the BCSO is obviously an adverse employment action.[6] SMF ¶ 50. That leaves the third element: causal connection. Here, the BCSO placed Plaintiff on administrative leave the very same day he returned from medical leave. And he was terminated just a few weeks later. "[C]lose temporal proximity between an exercise of FMLA rights and termination is 'strongly suggestive' of retaliation." *Lopera v. Compass Grp. USA, Inc.*, 578 F. Supp. 3d 130, 137 (D. Mass. 2021) (quoting *Oliver v. Digit. Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988)). State law under the PFMLA is even stricter. "Under the anti-retaliation provision of the PFMLA, an employer 'shall be presumed' to have retaliated against an employee if it makes any 'negative change in the . . . status' of the employee within six months of the employee taking family or medical leave." *Wright v. Micro Focus, LLC*, 2025 WL 1531346, at *2 (D. Mass.

[6] The BCSO argues that because the reorganization of the office and the IA investigation began before Plaintiff's medical leave, he cannot assert a claim for retaliation. Dkt. 42 at 10 ("[T]he undisputed summary judgment record establishes that both the office-wide reorganization and the IA investigation leading to termination were initiated by Sheriff Heroux *before* the Plaintiff engaged in any FMLA or PFMLA protected activity." (emphasis added)). But importantly, Plaintiff's *termination*—which occurred after his protected activity—is the adverse employment action at issue. The BCSO does not dispute that Heroux was aware of Plaintiff's medical leave when he ultimately terminated Plaintiff in September 2023.

May 29, 2025) (alteration in original) (quoting Mass. Gen. Laws ch. 175M, § 9(c)).[7] For this reason, Plaintiff has established a prima facie case.

Similarly, the BCSO has met its burden of proffering a non-discriminatory reason for Plaintiff's termination. Generally, while "an employer may not use an employee's FMLA leave as a negative factor in deciding to hire, fire, promote, or provide benefits to an employee . . . an employee may nevertheless be discharged, not promoted, or denied benefits for independent reasons during or after [his] taking of FMLA leave." *Carrero-Ojeda*, 755 F.3d at 719; *see also Nagle v. Acton Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 3 (1st Cir. 2009) ("Where an employee properly takes FMLA leave, the employee cannot be discharged for exercising a right provided by the statute, but can still be discharged for independent reasons."). The BCSO asserts that Plaintiff was terminated for two related reasons. First, as part of a full-scale reorganization of the BCSO, Heroux decided to eliminate the Task Force, and consequently, Plaintiff's position. SMF ¶ 11–13; *see also* Dkt. 48 at 4. But the reorganization alone cannot provide a plausible non-discriminatory explanation of Plaintiff's termination. After disbandment, the other three BCSO employees on the Task Force were reassigned—only Plaintiff was fired. Dkt. 44-6 at 14 ("Q: Now, is it accurate to say that the other three people on the [T]ask [F]orce were placed in positions at the jail? A: Yes."). The BCSO therefore also relies on Plaintiff's alleged misconduct as justification for not

---

[7] To rebut the PFMLA's presumption of retaliation, the employer must present "clear and convincing evidence that the employer's action was not retaliation against the employee and that the employer had sufficient independent justification for taking such action and would have in fact taken such action in the same manner and at the same time the action was taken, regardless of the employee's use of leave." Mass. Gen. Laws ch. 175M, § 9(C). This is a more burdensome standard than *McDonnell Douglas*. Because the Court ultimately denies summary judgment on the FMLA retaliation claim, the Court need not provide a detailed accounting of the similar reasons for denial under the PFMLA's stricter standard.

reassigning Plaintiff to another role, unlike the other Task Force members.[8] Dkt. 44-13 at 1; *see also* Dkt. 48 at 4.

As the Court discusses in greater detail *infra*, the suspicious timing of the IA report weakens the probative value of its ultimate findings. However, the Court will consider the allegations detailed in the IA Report for the limited purpose of belatedly explaining what Heroux might have known at the time of Plaintiff's termination, not as proof of whether Plaintiff actually committed misconduct.[9] For that limited purpose, the preliminary findings of the investigation detailed in Plaintiff's termination letter, Dkt. 43-15 at 1, combined with Heroux's plans to reorganize the BCSO, SMF ¶ 11, could constitute "a sufficient basis for [Plaintiff's] termination," *Lopera*, 578 F. Supp. 3d at 137 (finding the defendant met its burden to show a non-discriminatory reason by alleging performance issues). Therefore, the BCSO has established a non-discriminatory justification for Plaintiff's dismissal.

Finally, the burden shifts back to Plaintiff to prove that the BCSO's stated reasons for his termination are merely pretextual. Evidence of pretext may include "weaknesses, implausibilities,

---

[8] Though Plaintiff deems the IA Report "irrelevant" and vociferously disputes its findings, SMF ¶¶ 26–27, 35–42, 44, the Court finds it relevant, insofar as it provides an accounting—albeit well after Plaintiff's termination—of the reasons Heroux declined to reinstate Plaintiff. However, as discussed in greater detail below, the ability of this report to fully rebut the prima facie case of retaliation is greatly undermined by its completion after initiation of this lawsuit. Dkt. 43-11 at 1. Importantly, as in *Carrero-Ojeda*, the Court "make[s] no judgment as to whether [Plaintiff] actually committed this misconduct." *Carrero-Ojeda*, 755 F.3d at 720 n.6; *see also Gordon v. EarthLink, Inc.*, 2017 WL 3203385, at *5 (D. Mass. July 27, 2017) ("[I]t does not matter whether the company correctly concluded that plaintiffs had engaged in misconduct; what matters is that an investigation occurred, and as a result, that members of the committee believed that the plaintiffs had engaged in misconduct.").

[9] Nor is the IA investigation *itself* a form of retaliation because it began before Plaintiff's medical leave. Plaintiff claims that the IA investigation commenced after he took medical leave, thus leading to an inference of retaliation. Dkt. 44 at 15. But the documentary evidence, *see generally* Dkt. 43-11, Heroux's deposition, Dkt. 43-3 at 5–7, and Silva's deposition, Dkt. 43-10 at 2–3, all confirm that the investigation began before Plaintiff took medical leave. Plaintiff offers no evidence to suggest otherwise. Instead, he points to an email chain dated February 10, 2026, which includes correspondence between Heroux, Silva, and other BCSO employees regarding the investigation. See SMF ¶ 14; *see generally* Dkt. 43-14. This email chain is unavailing. It does not indicate, as Plaintiff claims, that Heroux initiated the investigation after Plaintiff took medical leave—instead, it merely demonstrates that the investigation into Plaintiff was underway as of February 10, 2023.

inconsistencies, incoherencies, or contradictions in the employer's proffer, the close temporal proximity between the protected conduct and the adverse action, or the sequence of events leading up to the adverse action." *Fournier v. Massachusetts*, 2021 WL 4191942, at *4 (1st Cir. Sep. 15, 2021) (internal quotation marks omitted). Generally, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens*, 144 F.3d at 167 (quoting *Stepanischen v. Merch. Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983)).

Here, two things militate against granting summary judgment. First, while the BCSO's proffered reasons for terminating Plaintiff are clear, the "close temporal proximity" between the end of Plaintiff's medical leave and his termination nevertheless give rise to an "inference of retaliatory motive." *Hodgens*, 144 F.3d at 168 (quoting *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996)). Plaintiff was placed on administrative leave just one day before returning from his medical leave, and was terminated shortly thereafter.

Second, a reasonable jury could find the timing of the finalized IA Report is probative of pretext. On October 23, 2023, the BCSO informed Plaintiff that the IA investigation "stopped" subsequent to his termination, that "there [was] no final investigation report," and that the BCSO had "no current plans to continue and complete the investigation." Dkt. 44-13 at 1. Then, weeks after Plaintiff filed his lawsuit against the BCSO—and three days before the BCSO filed its answer in this case—the IA Report was purportedly completed. SMF ¶ 47. Given the suspect timing of the IA Report, at least some of the BCSO's non-discriminatory reasons could be construed as "after-the-fact justifications, provided subsequent to the beginning of legal action." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000). What is more, the

termination letter and Heroux's deposition both affirm that Plaintiff was not terminated "because of the [IA Report]." Dkt. 44-6 at 21; *see also* Dkt. 43-15 at 1. This is sufficient to raise a triable issue of fact regarding pretext.

All-in-all, "[a]lthough [Plaintiff's] claim is by no means a lock, there is enough to give pause in [the] circumstances surrounding" his termination. *Wright*, 2025 WL 1531346, at *3. Plaintiff was the only member of the Task Force to be terminated instead of reassigned. Any justifications for that distinction found in the IA Report, while potentially persuasive, were finalized only after this litigation began. On this record, Plaintiff has raised a genuine material factual dispute on the issue of pretext. Accordingly, the Court declines to grant summary judgment on Plaintiff's retaliation claims.

## IV. Conclusion

For the foregoing reasons, the BCSO's motion for summary judgment is GRANTED as to the interference claims raised under FMLA or PFMLA and DENIED as to the retaliation claims under the same.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: October 16, 2026